UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Wesley Mullins,                                                           Civil No. 04-5050 (PAM/FLN)

        Plaintiff,

v.                                                                                **REPORT AND RECOMMENDATION**

Chris Salazar, Sgt. Hurd,
C.O. Gary, C.O. Valentine,
Ronald Ligions, Greg Smith, and
Lt. T. Putzier,

        Defendants.

_____

Pro Se Plaintiff.
Mark B. Levinger, Assistant Minnesota Attorney General, for Defendant.
_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on Defendants' Motion for Summary Judgment [#25]. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons which follow, this Court recommends Defendants' Motion be granted.

**I. BACKGROUND**

In December 2004, Plaintiff Wesley Mullins brought suit pursuant to 42 U.S.C. § 1983 against the Minnesota Department of Corrections ("DOC") and various DOC officials. See Complaint [#1]. He alleges that while in custody at the Minnesota Correctional Facility in Stillwater ("MCF-STW"), he was threatened by prison officials and fellow inmates. See id. p. 6; 8-12. Plaintiff alleges that he was retaliated against for "filing and winning a previous lawsuit[.]" Id.,

(referring to Mullins v. Crist, File No. 00-2051 (PAM/RLE)).[1]

Plaintiff was initially incarcerated in 1998, following a conviction for attempted criminal sexual conduct, at the Minnesota Correctional Facility in Saint Cloud, Minnesota ("MCF-SCL"). See Rudeen Aff. [#32], Exh. 2. In November of 2001, Plaintiff was transferred from MCF-RC to MCF-STW, where Defendant Chris Salazar ("Salazar") was employed as a Correctional Officer. See Salazar Aff. [#29], ¶ 1,; Rudeen Aff., Exh. 2. Salazar had been previously disciplined for inappropriate behavior towards Plaintiff in April of 1999. See Rudeen Aff., ¶ 4. Following his return to MCF-STW, Plaintiff alleges that Salazar retaliated against him by threatening him with physical harm. See Complaint, p. 15. Plaintiff alleges that Salazar stated, "You may have won $2,000, but what [sic] until I beat your $2,000 ass." Id. Plaintiff also alleges that Salazar flipped him off, passed gas on him and told other inmates that Plaintiff was a "fag & snitch to beat my ass[.]" Id. In response, Salazar denies Plaintiff's allegations, but asserts that he does remember Plaintiff saying something to the effect of "thanks for the money - I bought a TV with it[,]" to which Salazar responded that he did not know what Plaintiff was talking about. Salazar Aff., ¶ 3. Salazar further asserts that he tried to avoid specific contact with Plaintiff due to accusations made by Plaintiff against Salazar in the past. Id., ¶ 6.

Plaintiff alleges that he was transferred back to MCF-SCL in December of 2001, so that he would not have contact with Salazar. Complaint, p. 8. Plaintiff was subsequently transferred to the Minnesota Correctional Facility in Oak Park Heights, Minnesota ("MCF-OPH") and the Minnesota Correctional Facility in Moose Lake, Minnesota ("MCF-ML"). See Rudeen Aff., Exh. 2. In

---

[1] In May of 2001, the State of Minnesota entered into a Settlement Agreement and Release in Mullins v. Crist. See Rudeen Aff., Exh. 3.

September of 2003, Plaintiff returned to MCF-STW. See id.; Complaint, p. 8. Plaintiff alleges that he again had contact with Salazar who would "stalk plaintiff, flip him off, and make derogatory threatening gestures by shaking his fist at [Plaintiff]." Id. In November of 2003, Plaintiff was transferred to the Minnesota Correctional Facility in Rush City ("MCF-RC"). Id. While in MCF-RC, Plaintiff was almost continuously in the segregation area due to disciplinary infractions. Putzier Aff., Exh. 6; Smith Aff. [#31], ¶ 2.

Plaintiff alleges that in September of 2004, he requested that he be transferred to MCF-OPH "for security and other safety reasons." Complaint, p. 8. In October of 2004, Plaintiff met with MCF-RC Corrections Program Director Greg Smith ("Smith") and his Case Worker Lori Korts ("Korts"). Smith Aff., ¶ 4. According to Plaintiff the meeting was held to discuss "transfer amongst other issues." Complaint, p. 8. According to Smith, a meeting with Plaintiff and Korts was held with the primary focus of the meeting being Plaintiff's behavior towards Korts. See Smith Aff., ¶ 5. Plaintiff had been writing extremely derogatory and inappropriate things to Korts, including comments about her appearance. Id. Plaintiff was subsequently transferred to MCF-STW in October of 2004, perhaps due to his negative behavior and extensive disciplinary record. Id., ¶ 4. Upon arrival at MCF-STW, Plaintiff alleges that he was greeted by Salazar. Complaint, p. 8. Plaintiff alleges that Salazar referred to him as a "pencil pusher" and "worthless piece of shit." Id., p. 8, 15.

On October 20, 2004, Plaintiff alleges that he was assaulted by an unknown individual in his cell. Id., p. 9. The individual allegedly threw hot coffee, mixed with urine and an unknown milky substance, through Plaintiff's cell bars on Plaintiff, while calling him a "snitch []homo fag." Id. Plaintiff alleges that the individual also pulled Plaintiff's right arm through the bars, leaving bruises.

Id. Plaintiff sent a kite, dated October 20, 2004, which alleged that several inmates had come to his cell on Sunday morning[2] and thrown an unknown substance mixed with coffee. See Putzier Aff. [#30], Exh. 2. There is no record that Plaintiff otherwise alerted staff to the alleged incident. See id., ¶ 8.

On October 22, 2004, Lieutenant Timothy Putzier ("Putzier") met with Plaintiff regarding a number of issues, including his allegations of threats and assault. See id., ¶ 4, Exh. 2. According to Putzier, most of the issues raised by Plaintiff had been resolved or were raised because of a misunderstanding of applicable institution policies. Id. Mullins informed Putzier that he had not been threatened personally, but that another offender stated that he had overheard someone talking about him. Id., ¶ 6. According to Putzier, Plaintiff indicated that at that point things were fine as they were. Id.

On October 30, 2004, Plaintiff alleges that an unknown individual "threw a container of 'Bootyjuice,' which consists of sour milk urine, and fecal matter" on Plaintiff while he was in his cell. Complaint, p. 9. Plaintiff alleges that the liquid got on his clothes, bedding, paperwork and cell floor. Id. Plaintiff reported the alleged incident to Correctional Officer Eric Martinson ("Martinson"). Putzier Aff., Exh. 5, p. 4. Martinson indicated that he would check into it, but he was unable to find out who had thrown the liquid on Plaintiff. Id. According to Plaintiff, Martinson went to his neighbor's cell, where he stated, "If he learn [sic] to shut his big fucking mouth, this wouldn't happen." Complaint, p. 9. Plaintiff states that in order to be moved, he threw a carton of sour milk in Martinson's face. Id. According to Martinson's incident report, Plaintiff asked Martinson if he "want [sic] to start shit to [sic]" and threw the container of sour milk. Putzier Aff.,

---

[2] "Sunday morning" would most likely have been October 17, 2004, three days earlier.

Exh. 5, p. 4, 8.  The container hit Martinson in the shoulder and got in his hair.  Id.  Plaintiff was removed from his cell and placed on "quiet status."  Id., p. 5-6.  While he was being moved from his cell, some unknown prisoners were chanting "beat his ass."  Id., p. 6.

Plaintiff alleges that while he was in segregation, he was allowed no clean clothes, proper medications, access to hygiene, and a shower only once every three days.  Complaint, p. 9.  On November 6, 2004, Plaintiff claims he was taken to "the box" for telling an unknown individual "to get the hell away from [his] cell as he was harassing [Plaintiff] into bad behavior and [Plaintiff] told him he was a disgrace to the blacks for snitching on people."  Id.  According to the incident report of Correctional Officer David Valentine ("Valentine"), Plaintiff was moved to the modified quiet cell after Valentine heard him yelling "these fucking niggers" repeatedly.  Putzier Aff., ¶ 18, Exh. 9.  Plaintiff was given a direct order to stop yelling out of his cell, to which he replied, "fuck that I can yell if I want."  Id.  Plaintiff was given several more direct orders before being moved to the quiet cell.  Id.

Plaintiff claims that while in the quiet cell, Correctional Officer Scott Gary ("Gary") told an unknown individual not to give Plaintiff his medications, and that Plaintiff did not receive his medications for two days.  Complaint, p. 10.  According to the incident report of a Correctional Officer Yurick, on the evening of November 6, 2004, Plaintiff yelled at the nurse on medication rounds.  Putzier Aff., Exh. 9.  Plaintiff reportedly told the nurse to "get away from my door your fucking bitch, it's not a good idea to open that book pass right now."  Id.  As the nurse proceeded on with her medication round, Plaintiff started calling Sergeant Jenny Carufel a "whore."  Id.

On November 6 and 7, 2004, Plaintiff filed grievances regarding the alleged incidents.  See Rudeen Aff., Exh. 1.  The grievances were denied on November 10, 2004, with the explanation that

Plaintiff had exceeded the allowed number of pages and that he had not attached copies of kites showing that he had tried to resolve the issues informally.  See id.  It was also noted that he needed to wait until he had received a response from staff before filing a grievance.  Id.

On November 14, 2004, Plaintiff alleges that Sergeant Hurd ("Hurd") and other unidentified individuals attempted to move him to a different location where "inmate fecal matter was to be thrown on me and/or my new cell."  Complaint, p. 10.  Plaintiff alleges that other unidentified individuals were "setting [him] up with contraband under [his] lightswitch[.]"  Id.  On November 15, 2004, Plaintiff claims that a correctional officer left his slot open, in order to allow fecal matter and urine on himself or his cell.  Id., p. 11.  Plaintiff alleges that Hurd allowed fellow inmate Ronald Ligions to go into his cell and defecate in a milk container, which presumably was to be passed off to another inmate and thrown into Plaintiff's cell.  Id.  Plaintiff states that nothing happened, but that he "was prepared for it."  Id.

That same day, Plaintiff alleges that he talked to a psychologist in order to report the above listed allegation.  Id.  As a result, Plaintiff alleges that he was locked down for 3-4 days without a shower or hygiene products.  Id.  Plaintiff claims that he now has a "permanent wring [sic] around [his] neck that won't ever come clean."  Id.

On November 17, 2004, Plaintiff was transferred to MCF-OPH.  See Rudeen Aff., Exh. 2. Plaintiff commenced this lawsuit on December 17, 2004.  On April 19, 2005, Plaintiff's sentence expired and he was discharged from the Minnesota Correctional Facility at Oak Park Heights.  As of that date, Plaintiff was no longer in the care or custody of the DOC.  Kirch Aff. [#20] at ¶ 2.

## II.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate where there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. Catrett, 477 U.S. 317, 322-23 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. See Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The Court must view the evidence, and the inferences drawn from the evidence, in the light most favorable to the nonmoving party. See Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). However, "summary judgment procedure is properly regarded not as a disfavored shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just speedy, and inexpensive determination of every action.'" Celotex, 477 U.S. at 327.

### B.  Exhaustion of Administrative Remedies

Defendants first argue that they are entitled to summary judgment because Plaintiff has failed to exhaust his administrative remedies. In enacting the Prison Litigation Reform Act, Congress included an exhaustion requirement, providing as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. §1997e(a).

The Supreme Court has construed this provision broadly, and has held that the doctrine requires prisoners to exhaust all available administrative processes, where those processes have the authority to take some remedial action, even if they cannot take the specific remedial action that is demanded by the prisoner. See Booth v. Churner, 531 U.S. 956 (2001); Johnson v. Jones, 340 F.3d 624, 627 (8th Cir. 2003) ("If exhaustion was not completed at the time of filing, dismissal is mandatory.").

In this case, as pointed out by Defendants, Plaintiff initiated grievance proceedings in November of 2004. His grievance, however, was returned to him because he exceeded the allowable number of pages and because he failed to attach copies of kites showing that he had tried to resolve the issues informally. There is no evidence that he attempted to refile his grievance. There is likewise no evidence that Plaintiff attempted to administratively remedy any of the alleged incidents occurring after November 7, 2004. Plaintiff has not filed a responsive pleading, despite the Court's direction that he do so prior to April 7, 2006. [#36]. Based on the undisputed evidence in the record, the Court concludes that Plaintiff failed to exhaust his available administrative remedies. Accordingly, it is recommended that Plaintiff's claims with respect to Defendants Salazar, Hurd, Gary, Valentine, Smith, and Putzier be denied and that they be dismissed from this action.

## III. RECOMMENDATION

Based upon the file, record and proceedings herein, it is **HEREBY RECOMMENDED** that:

1. Defendants' Motion for Summary Judgment [#25] be **GRANTED**; and
2. Defendants Chris Salazar, Sgt. Hurd, C.O. Gary, C.O. Valentine, Greg Smith, and Lt. T. Putzier be dismissed**.**

DATED: August 15, 2006              *s/ Franklin L. Noel*
                                    FRANKLIN L. NOEL

United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **September 1, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals..